IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## MATTHEW L. MOATES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Monroe County**
**No. 98-251     Carroll L. Ross, Judge**

_____

**No. E2003-01926-CCA-R3-PC**
**May 27, 2004**
_____

The petitioner, Matthew L. Moates, appeals the Monroe County Criminal Court's denial of his petition for post-conviction relief from his conviction for aggravated robbery and resulting sixteen-year sentence.  He claims (1) that he received the ineffective assistance of counsel because his attorney failed to call witnesses to testify at trial about the length of his hair at the time of the robbery, (2) that the state improperly struck an African-American juror from the jury, (3) that he is entitled to a new trial because he was not present during a conference in which the state and his trial attorney discussed the African-American juror's dismissal, and (4) that a state witness improperly communicated with a juror during his trial.  We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Peter J. Alliman, Madisonville, Tennessee, for the appellant, Matthew L. Moates.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William W. Reedy, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the petitioner's robbing a Phillips 66 convenience store in Sweetwater on April 2, 1995.  A jury convicted the petitioner, and this court affirmed the conviction.  See State v. Matthew L. Moates, No. 03C01-9610-CR-00383, Monroe County (Tenn. Crim. App. June 24, 1997), app. denied (Tenn. Mar. 2, 1998).  On appeal, this court stated the following facts:

> Kay Lowe testified at trial that she was working at the store the night
> of the robbery, and her nephew, Tim West, was staying with her.  At
> around 5:00 am, a man entered the store ostensibly to buy a carton of

cigarettes. As Ms. Lowe rang up the sale, he produced a gun and said, "Now I want all your money." After she gave him the cigarettes and cash drawer he ordered them both to lie face down on the floor. At first, Tim West thought he was joking, but he told him, "Get over here. This is no joke," and both obeyed. They waited on the floor until another customer came in, and then called the police. Both victims described the robber to the police as a white male with long dark hair and a moustache, a red checkered shirt and possibly blue jeans. They both identified the defendant as the robber in a photo line-up shown them three months later, and also in court at trial. Ms. Lowe also testified that some time later she saw someone that looked like the robber at the local Krystal drive-in window, and called the police, but that nothing came of it.

Mary Ann Clingan testified that during the time of the robbery, while her husband was serving time in jail, the defendant was staying with her. The morning of the robbery she and the defendant were returning to Bradley County from Sevierville when she pulled off the highway [into] the Phillips 66 store lot, and gave the defendant two dollars to get her some cigarettes. She parked around the side of the store and could not see into the store. The defendant was wearing a red, multicolored flannel shirt and blue jeans. After about five minutes, he came running out of the store with a black gun in his hand, and later showed her about $150 which he said he got at the store. They then continued on to her house. She claimed she did not call the police because she was afraid for her children. At the time of the trial, she was under house arrest, charged with being an accessory after the fact to the robbery.

The defense called two witnesses. One testified that Ms. Lowe told her the robber was six feet tall, had long black hair, was tan, and that she had seen him at a local restaurant some time after the robbery. The other witness testified that the morning of the robbery the police asked him to go down to the station, took his picture, and questioned him about the robbery, stating they were looking for "a local guy."

Matthew L. Moates, slip op. at 2-3.

At the evidentiary hearing, the petitioner's trial attorney testified that during jury voir dire, the state used a peremptory challenge to excuse Karen Peak from the jury. He said that Ms. Peak was the only African-American present and that he "took offense" to her being excluded from the panel. He said that he did not object immediately to her being dismissed because he did not know

if <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986), applied to white defendants. He said that he later raised the issue during a break in the trial but acknowledged that he may have raised the issue after the jury had been sworn and after opening statements. He said that he also raised the issue in the petitioner's motion for new trial, that he argued the issue at a hearing on the motion, and that he raised this issue in the appeal of the petitioner's conviction.

The petitioner's trial attorney said the petitioner told him that the petitioner did not rob the store, that Mary Ann Clingan was making up her story, and that Ms. Clingan was retaliating against him for reporting Ms. Clingan's and her husband's whereabouts to the Sevier County Police. He acknowledged that eyewitness identification of the robber was a key issue in the case, that the state's two eyewitnesses said the robber had long black hair, and that the petitioner thought the robber's hair length was an important issue. He said that he received a list of witnesses who could testify at trial about the petitioner's hair length and acknowledged that Penny Moates, the petitioner's ex-wife, and Dorothy Nichols, the petitioner's ex-mother-in-law, gave pretrial statements about the petitioner's hair. He said that Pat Kelly, the petitioner's probation officer, also could have testified at trial about the petitioner's hair and that in his case notes, he wrote that he needed to subpoena Mr. Kelly. He said that he later talked with Mr. Kelly and that Mr. Kelly told him, "You don't want me as a witness." He said that explaining to the jury how Mr. Kelly knew the petitioner would have been difficult and that a subpoena was never issued. He acknowledged that the petitioner wanted him to contact James Clingan, Mary Ann Clingan's husband, but did not remember if he contacted Mr. Clingan. He said the petitioner told him that Ms. Clingan had been living with a man named Wayne Mullins at the time of the robbery and that Mr. Mullins fit the robber's description perfectly. He said he tried to find Mr. Mullins but could not. He said he did not call any of the witnesses on the petitioner's witness list to testify and acknowledged that it would have been helpful at trial to show that the petitioner's hair was not long and black at the time of the robbery. He acknowledged that Becky Hazen was on the petitioner's witness list, that Ms. Hazen said the petitioner's hair was short at the time of the robbery, and that he never called Ms. Hazen to testify. He also acknowledged that after the trial, the petitioner sent him a letter in which the petitioner complained about his not subpoenaing Pat Kelly and about his not obtaining a photograph that the Department of Paroles took of the petitioner in April 1995.

The petitioner's trial attorney testified that Ms. Clingan entered into a plea agreement with the state but that he was never able to get any information about the agreement. He said he contacted her attorneys but still was unable to learn anything about the agreement. He acknowledged that he questioned Ms. Clingan about a plea agreement at trial and that she denied having an agreement with the state. He acknowledged that at some point after the trial, the petitioner told him the petitioner's sister had seen Ms. Clingan talking to a juror in the hallway during a break in the trial. He said he did not remember talking to the petitioner's sister but was almost certain he did. He said he raised this issue in the petitioner's motion for new trial and in the appeal of the petitioner's conviction.

Gary Johnson testified that he met the petitioner in early 1995 and that the petitioner was working for him when the petitioner was arrested in June 1995. He said that at that time, the petitioner's hair was short and fairly neat and that he had never known the petitioner to have

shoulder-length black hair. He said that a composite drawing of the robbery suspect did not look like the petitioner and that the petitioner's trial attorney did not talk to him or ask him to testify. He said that he used to let the petitioner drive his truck, which was full of tools, and that he would have testified for the petitioner at trial. On cross-examination, he said the petitioner was on parole when he hired the petitioner but could not remember if the petitioner had told him the petitioner was on parole for aggravated robbery. He said that he talked with the petitioner over the telephone while the petitioner was in jail and awaiting trial in this case and that the petitioner never asked him to contact his attorney.

Judy Johnson, Gary Johnson's wife, testified that the petitioner's hair at the time of the robbery was short and cut over his ears. She acknowledged that the petitioner's hair had not been shoulder-length and said that the petitioner did not look like the composite drawing. She said she would have testified for the petitioner at trial.

Dorothy Nichols testified that the petitioner used to be married to her daughter and that the petitioner's hair always had been short. She said that the petitioner's hair did not touch his collar, that it had always been cut around his ears, and that she had never known the petitioner to have shoulder-length black hair. She said that the petitioner's trial attorney never contacted her and that she would have testified for the petitioner at trial. She acknowledged signing a statement on July 27, 1995, in which she said the petitioner always had kept his hair short and parted on one side. On cross-examination, she said that she had never known the petitioner to wear a wig in order to alter his appearance and that the petitioner always had been polite and kind to her.

Shannon Geames Whaley, the petitioner's sister, testified that on April 2, 1995, the petitioner's hair was short, cut over his ears, and combed to one side. She said that she had never known the petitioner to have another hairstyle and that the composite drawing of the robbery suspect did not look like him. She said that the petitioner's attorney never contacted her but that she was at the petitioner's trial and would have testified for him. She said that during a recess, she saw Mary Ann Clingan talking to a juror and that they seemed to be good friends. She said that she told the petitioner about what she had seen, that the petitioner appeared to tell his trial attorney about it, and that his trial attorney never contacted her. On cross-examination, she said she never contacted the petitioner's attorney about the length of the petitioner's hair.

James Clingan, Mary Ann Clingan's husband at the time of the robbery, testified that he currently was serving twelve years in the Department of Correction for drug convictions. He said that he met the petitioner in prison in 1990 and that he married Mary Ann Clingan in 1995. He said that at the time of the Phillips 66 robbery, he was in jail on drug charges. He said that his bond was $20,000 in that case, that his wife was trying to get the money to make his bond, and that his wife said she was going to do whatever it took to get the money. He said that after he made bond, he and his wife fled to Dayton and later were arrested in Sevierville. He said his wife accused the petitioner of committing the Phillips 66 robbery because she believed the petitioner reported them to the Sevierville police. He said that his wife had been having an affair and living with Wayne Mullins

at the time of the robbery and that his wife told him Mr. Mullins robbed the Phillips 66 store.  He said the petitioner's attorney never contacted him.

On cross-examination, Mr. Clingan testified that he and the petitioner had been good friends before the robbery and that he did not like Mr. Mullins because Mr. Mullins had been having an affair with his wife.  He said that his wife convinced him the petitioner had turned them in to the police and that he did not know if he would have testified for the petitioner at trial.  Later, though, he testified that by the time of the petitioner's trial, he knew that his wife had lied to him and that he would have testified for the petitioner.  He acknowledged that he would have had to testify as a convicted felon.

The petitioner testified that the public defender had been appointed to represent him in this case and that in August 1995, he gave the public defender a list of witnesses who could testify about his hair.  He said he also told the public defender that Mary Ann Clingan had threatened him with false charges and had falsely accused him of committing another robbery in Athens.  He said the public defender later withdrew from his case because the public defender's office also was representing Mary Ann Clingan.  He said that his trial attorney replaced the public defender and that his trial attorney received the witness list from the public defender's file.  He said that his trial attorney knew that his ex-mother-in-law and his ex-wife had given statements about his hair length but that his attorney did not call them to testify.  He said his attorney also never contacted James Clingan.  He said that Mary Ann Clingan had been living with Wayne Mullins at the time of the robbery and that Mr. Mullins looked like the composite drawing.  He said that he told his attorney to find Mr. Mullins but that his attorney never did.  He said that he gave his trial attorney a second witness list but that his attorney never contacted anyone on the list.  He said that during the trial, he told his attorney that his sister had seen Ms. Clingan talking to a juror outside the courtroom.

On cross-examination, the petitioner testified that he had prior felony convictions for writing bad checks, attempted burglary, aggravated robbery, and breach of trust and that he was in jail while awaiting trial in this case.  He said that at the time of his trial, he and his wife were getting a divorce and were not on friendly terms.  He said he did not ask her to contact his trial attorney because she would not have done that for him.  He said, though, that his attorney could have subpoenaed her and that she would have testified truthfully about his hair.  He said it was his attorney's job to contact the people on his witness lists.  He acknowledged that eyewitnesses identified him as the robber in a photograph array before trial and in court.  He said he had not wanted Pat Kelly to testify at trial unless absolutely necessary because he was afraid the jury would learn from Mr. Kelly that he was on parole.  He acknowledged that while he was awaiting trial, he and James Clingan were not on good terms but said that Mr. Clingan would have testified favorably and honestly at his trial.  He said he did not testify because he did not want the jury to find out about his prior convictions.

The petitioner acknowledged that a wig could have made his hair look longer but said that no witnesses at trial ever claimed  he wore a wig during the robbery.  He said he did not believe his sister lied about seeing Mary Ann Clingan talking to a juror.  He said that this was his first jury trial

and that he always had pled guilty before because he was guilty in his other cases. He said he had not known that he could fire a court-appointed attorney.

Richard Newman testified that he tried the petitioner's case for the state. He said that during jury voir dire, Detective Earl Long told him that a potential juror, Karen Peak, lived in a high-crime neighborhood and that her close relative recently had been convicted of a crime. He said that based on what Detective Long told him, he used a peremptory challenge to exclude Ms. Peak from the jury. He said that the attorneys met with the trial judge in chambers, that the defense challenged the state's excluding Ms. Peak from the jury, that he told the trial court the state's two reasons for challenging Ms. Peak, and that the trial court accepted the reasons. He said that the petitioner's hair was longer at trial than it was at the evidentiary hearing and that when Mary Ann Clingan was not testifying, the state kept her in a conference room with the state's victim/witness coordinator. On cross-examination, Mr. Newman acknowledged that he did not know if Ms. Clingan ever was in the hallway outside the courtroom during the petitioner's trial. He said that in his opinion, the photograph of the petitioner in the photograph array was similar to the composite drawing of the suspect. He said that the defense could have objected immediately to Ms. Peak's being dismissed from the jury panel but that it did not. He said that the meeting in the judge's chambers occurred before the jury was sworn, that he told the trial court what Detective Long had told him about Ms. Peak, and that "there was some discussion if we would have to, to put her on the jury." He said the trial court concluded that the state's reasons for excluding Ms. Peak from the jury were sufficient.

Denise Barnes, the court reporter at the petitioner's trial, testified that the prosecutor and the petitioner's trial attorney met in the judge's chambers to discuss Ms. Peak's being dismissed from the jury. She said that during the meeting, the state revealed that Ms. Peak's husband recently had been convicted of a sex crime and that the parties discussed his conviction as a reason for the state's excluding Ms. Peak from the panel. She said that the petitioner was not present and that the meeting was not transcribed.

The parties stipulated that two other witnesses would have testified at the evidentiary hearing about the length of the petitioner's hair at the time of the robbery and that the witnesses would have said the composite drawing did not look like the petitioner. The parties also stipulated that Pat Kelly of the Department of Paroles was the petitioner's probation officer at the time of the robbery and that the petitioner had been photographed in 1995 for a new parole identification card. Mr. Kelly would have testified that the photograph had been destroyed years later and that he did not remember the petitioner's hairstyle at the time of the robbery.

The trial court denied the petition for post-conviction relief. Regarding the petitioner's claim that his attorney was ineffective for failing to call any witnesses to testify about the length of his hair at the time of the robbery, the trial court noted that the petitioner's witnesses at the evidentiary hearing did not claim to know the petitioner's whereabouts at the time of the robbery, offered no explanation as to why the state's witnesses selected the petitioner's photograph from the photograph array, and offered no explanation as to why the state's witnesses identified the petitioner at trial as the robber. The trial court noted that James Clingan's testimony was not credible and determined

that given the eyewitnesses' identifications of the petitioner, the petitioner's trial witnesses would not have changed the outcome of his case. Regarding the petitioner's claim that the state improperly excused Karen Peak from the jury, the trial court held that the issue had been decided by this court in the petitioner's appeal of his conviction. The trial court also held that the petitioner had not been prejudiced by his absence when the parties discussed Ms. Peak's dismissal in the court's chambers. Finally, the trial court stated that it did not believe the petitioner's or Ms. Whaley's testimony about Ms. Whaley seeing Mary Ann Clingan talking to a juror during the trial.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner claims that he received the ineffective assistance of counsel because his attorney failed to call witnesses to testify at trial about the length of his hair. He contends that the witnesses could have changed the outcome of his case because the length of his hair was an important issue at trial, none of the state's witnesses claimed the robber wore a wig, and the defense witnesses would have testified that his hair was shorter than the robber's hair. The state claims that the petitioner did not receive the ineffective assistance of counsel. We agree with the state.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. T.C.A. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions

of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

In support of his argument, the petitioner cites Michael Eugene Duff v. State, No. E2000-03041-CCA-R3-PC, Knox County (Tenn. Crim. App. Nov. 14, 2002). In that case, three men using a blue emergency light pulled over the victim's car and raped her. The victim later picked out the petitioner's photograph from a photograph array and told a police officer that the photograph looked like the attacker in that his nose, face, and eyes were the same. However, the victim said that her attacker's hair was shorter than that in the picture and that her attacker did not have a mustache. The victim also viewed a six-man lineup, asked the men in the line-up to speak, and identified the petitioner as one of her attackers. The petitioner was convicted of two counts of aggravated rape and one count of aggravated kidnapping and later filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel because his trial attorney failed to call any witnesses to testify about his hairstyle at the time of the crimes. At the evidentiary hearing, the petitioner's aunt testified that she was at the petitioner's trial, was waiting outside the courtroom to testify, and would have testified about the petitioner's appearance at the time of the crimes. On appeal, this court noted that the petitioner's appearance had been a crucial issue at trial and held that the petitioner's attorney had no rational basis for not calling any witnesses to testify about the petitioner's appearance. However, because the post-conviction court did not state its findings regarding the credibility of the aunt's testimony at the evidentiary hearing, this court remanded the case with instructions that the trial court rule on the credibility of the aunt's testimony and whether her failing to testify prejudiced the petitioner's case. Michael Eugene Duff, slip op. at 10.

Initially, we note that the petitioner has not made the entire trial transcript part of the post-conviction record. However, we may take judicial notice of the record in the appeal of the petitioner's conviction. See State ex rel. Wilkerson v. Bomar, 213 Tenn. 499, 505, 376 S.W.2d 451, 453 (1964). While we agree with the petitioner that his appearance at the time of the crime was an important issue, we believe this case is significantly different from Michael Eugene Duff. In that case, the state's case primarily relied on the victim's identification of the petitioner. The victim noted several discrepancies in Mr. Duff's appearance and her attacker's appearance and only was able to identify the petitioner as one of her attackers after she heard him speak. In the present case, however, the evidence shows Kay Lowe and Tim West quickly picked the petitioner's photograph out of the photograph array and identified him at trial as the robber. In addition, Mary Ann Clingan testified that she was with the petitioner on the morning of the robbery, that they stopped at the Phillips 66 store, that the petitioner went inside, and that he ran out of the store with a gun. She also said that he told her he had taken $150 from the store. The trial court concluded that even if the petitioner's witnesses had testified, the state's eyewitnesses identifications still would have resulted in the petitioner's being convicted of robbing the store. We agree and conclude that even if the petitioner's attorney rendered deficient performance by failing to call witnesses to testify about the length of his hair, the petitioner has not demonstrated that he was prejudiced by the deficiency.

## II.  BATSON CLAIM

The petitioner contends that he is entitled to post-conviction relief because his equal protection rights were violated during voir dire when the state exercised a peremptory challenge to exclude the only African-American potential juror from the jury.  See Batson, 476 U.S. at 89, 106 S. Ct. at 1719.  He argues that although this court ruled on the issue in the appeal of his conviction, this court should reconsider the issue because this court was under the mistaken belief that his trial attorney objected to the juror's dismissal after the jury had been sworn. The state claims that this issue has been previously determined.  We conclude that the petitioner is not entitled to relief.

The record reflects that the state used a peremptory challenge to exclude Karen Peak from the jury and that the defense did not make a contemporaneous objection.  However, according to Mr. Newman's and Ms. Barnes' testimony at the evidentiary hearing, the parties met in the judge's chambers during or soon after jury voir dire in order to discuss Ms. Peak's dismissal.  In the meeting, which was not transcribed, the state told the trial judge that it had dismissed Ms. Peak because she lived in a high-crime neighborhood and because her husband recently had been convicted of a crime. After opening statements, the petitioner's attorney asked outside the jury's presence that the prosecution state on the record its reason for dismissing Ms. Peak from the panel.  The state responded that it had used a peremptory challenge to excuse Ms. Peak because her home address was in a known drug area.  The defense stated that it objected to her dismissal, and the trial court stated that the objection would be noted for the record.  The trial transcript shows that the jury then was sworn and that the state's first witness took the stand.

In the petitioner's new trial motion, the petitioner's trial attorney argued that the trial court erred by allowing the state to dismiss Ms. Peak from the jury, and the trial court denied the motion. On appeal, this court held that the petitioner waived the issue because he did not object until after the jury had been sworn, although it also stated that even if the issue had not been waived, it was without merit.  Matthew L. Moates, slip. op at 5-6.

The petitioner claims that this court should reconsider the Batson issue because in the appeal of his conviction, this court decided the issue under the mistaken belief that he objected to Ms. Peak's dismissal after the jury had been sworn.  He also notes that this court ruled while unaware of the meeting in the trial judge's chambers.  In this regard, we believe that a determination based upon a mistaken view of the record may qualify as a previous determination so as to bar a grant of post-conviction relief.  However, to the extent that counsel failed to correct the mistaken view, the ineffective assistance of counsel may be involved.  In any event, we note that the trial court concluded that the state had given a racially neutral explanation for dismissing Ms. Peak.  Under the record before us, we conclude that the trial court did not abuse its discretion by accepting that state's explanation for dismissing Ms. Peak.  The petitioner is not entitled to relief on this issue.

## III. RIGHT TO BE PRESENT

The petitioner claims that he is entitled to a new trial because he was not present at the meeting in the judge's chambers in which the parties discussed the reasons for Ms. Peak's dismissal from the jury. He contends that this violated his right to be present at all stages of the proceeding under the federal and state constitutions and that he could not raise this issue sooner because he only learned about the meeting during the post-conviction evidentiary hearing. The state claims that the trial court properly ruled that the petitioner had failed to demonstrate that he was prejudiced by not being at the meeting. We conclude that the petitioner's not being present at the meeting does not entitle him to relief.

Pursuant to Rule 43(a), Tenn. R. Crim. P., a defendant must be present at every stage of the trial, "including the impaneling of the jury." However, a defendant does not need to be present at "a conference or argument upon a question of law." Tenn. R. Crim. P. 43(c)(3). A criminal defendant also has the right under the federal and state constitutions to be present at all critical stages of the proceeding. State v. Carruthers, 35 S.W.3d 516, 517 (Tenn. 2000). For example, under the Confrontation Clause, a defendant has the right to be present in order to confront witnesses and evidence against him. United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484 (1985). Under the Due Process Clause, a defendant has a right to be present "'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Gagnon, 470 U.S. at 527, 105 S. Ct. 1484 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S. Ct. 330, 332 (1934)); see also State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) (citing article I, § 9 of the Tennessee Constitution and stating that the "scope of [Rule 43] is broader than the constitutional right alone"). Post-conviction relief may be given only if a conviction is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103.

Before opening statements, the parties met privately in the judge's chambers to discuss the state's reasons for excluding Ms. Peak from the jury. During the conference, the trial court had to make a credibility determination as to the state's reasons for dismissing her from the panel. We question whether such a conference, in which the trial court makes a credibility determination and accepts the state's reasons for dismissing a juror, limits itself to a matter of legal argument. However, even if the petitioner was entitled to be present at the conference pursuant to Rule 43(a), the lack of his presence was harmless error because the petitioner has not shown prejudice. Moreover, his not being in the judge's chambers did not violate his constitutional rights. No witnesses or evidence was presented against him at the meeting. His trial attorney was present and challenged the state's dismissing Ms. Peak, and the petitioner does not claim that he received the ineffective assistance of counsel at the meeting. The state gave the trial court two race-neutral reasons for the state's dismissing Ms. Peak, and the trial court accepted those reasons. We hold that the petitioner's absence did not affect the trial court's ability to decide the issue and did not affect the fundamental fairness of his trial. The petitioner is not entitled to post-conviction relief.

## IV.  MS. CLINGAN'S COMMUNICATION WITH JUROR

Finally, the petitioner contends that he is entitled to post-conviction relief because the evidence shows that Mary Ann Clingan talked with a juror during the petitioner's trial.  Within this argument, the petitioner also contends that he received the ineffective assistance of counsel because although his trial attorney raised the issue in his motion for new trial, his attorney failed to argue the issue at the hearing on the motion and failed to raise the issue in the appeal of his conviction.  The state contends that the trial court properly held that the petitioner was not entitled to relief.  We agree with the state.

The petitioner's sister testified at the evidentiary hearing that she saw Ms. Clingan talking to a juror during the trial and that she told the petitioner about it.  The petitioner testified that he told his trial attorney about what his sister had seen.  In its order denying the petition for post-conviction relief, the trial court determined that the petitioner and his sister were not credible.   Moreover, it noted that the petitioner did not have Ms. Clingan or the juror testify about the alleged communication.  We note that the petitioner's attorney testified at the evidentiary hearing that the petitioner told him about Ms. Clingan's talking with the juror after the trial and that he raised the issue in the petitioner's new trial motion and in the petitioner's appeal of the conviction.  Our review of the record in the appeal of the petitioner's conviction shows that the petitioner's trial attorney raised this issue in the motion for new trial but does not show that he argued the issue in the direct appeal to this court.  Nevertheless, an attorney is not required to raise every issue on appeal.  State v. Draper, 800 S.W.2d 489, 498 (Tenn. Crim. App. 1990).  Given that the trial court did not believe the petitioner's and his sister's testimony and that the petitioner did not have Ms. Clingan or the juror testify about the communication, he has failed to show that his attorney rendered deficient performance by failing to raise the issue on appeal.  Thus, he has failed to show that he received the ineffective assistance of counsel.

Based upon the foregoing and the record as a whole, we affirm the trial court's denial of the petition for post-conviction relief.

_____
JOSEPH M. TIPTON, JUDGE